UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x

APRIL HARVIN,

               Plaintiff,                             Civil Action No.:

     -against-                              COMPLAINT
                                            Jury Trial Demanded

CENTER FOR ALTERNATIVE SENTENCING
AND EMPLOYMENT SERVICES, INC.,

               Defendant.
————————————————————————x

      PLAINTIFF APRIL HARVIN, by her attorney Goddard Law PLLC, whose offices are located at 39

Broadway, Suite 1540, New York, NY 10006, alleges upon knowledge with respect to herself, and upon

information and belief as to all other matters, as follows:

## STATEMENT OF THE CASE

      1.      This is a proceeding to enforce the rights of the Plaintiff and other persons similarly

situated, to equal employment opportunities, their rights as employees, and their civil rights as citizens of

the United States and as New York State residents. Plaintiff seeks money damages, as well as an injunction

restraining Defendant from maintaining a policy, practice, custom and/or usage of:

      2.      Discrimination against Plaintiff and other persons similarly situated because of race, and/or

skin color with respect to compensation, terms, conditions, and privileges of employment, including without

intending to limit, hiring, transfer, promotion and pay.

      3.      Limiting, segregating and classifying employees of Defendant in ways which deprive

Plaintiff and other persons similarly situated of equal employment opportunities and/or otherwise adversely

affecting their status as employees because of race and/or skin color.

      4.      Defendant has consistently and/or purposefully and/or negligently deprived Plaintiff and

other persons similarly situated of the rights guaranteed to them under Federal and New York State Laws

with the intent and design, both directly and indirectly, of fostering a hostile work environment resulting

from race and/or skin color discrimination, as well as retaliation, to the detriment of the Plaintiff and other persons similarly situated.

## THE PARTIES

5.      Plaintiff April Harvin ("Plaintiff") is an African-American female citizen of the United States who currently resides in Bronx County, New York.

6.      Plaintiff is and was, at all times relevant herein, an "employee" of the Center for Alternative Sentencing and Employment Services, Inc. (CASES) (hereinafter "Defendant") within the meaning of all relevant Federal, State and local laws, including, but not limited, to Title VII.

7.      Plaintiff was willing and able to perform her employment duties and obligations and was qualified for the employment positions she held at Defendant.

8.      Upon information and belief, at all times herein, Defendant was and is a corporation incorporated under the laws of the State of New York. Upon information and belief, Defendant's headquarters are located at 151 Lawrence Street, Brooklyn, New York 11201.

9.      Defendant is and was, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant Federal, State and local laws, including, but not limited to Title VII.

## JURISDICTION AND VENUE

10.     This is a civil action for monetary damages and such other relief as the Court deems just and proper based upon Defendant's long and continuing pattern of discrimination of Plaintiff based on race and/or skin color as well as retaliation against Plaintiff.

11.     This Court has jurisdiction over this action under 42 U.S.C.A. § 1981 et. seq., 42 U.S.C.A. § 2000(e) et. seq., 29 U.S.C. § 621 et. seq., and under 28 U.S.C.A. §§1331 and 1343(4). This Complaint is brought pursuant to Article 15 of the New York Executive Law, specifically Exec. Law §§ 290 et seq., ('Executive Law"), which is known as the Human Rights Law, and Title 8 of the Administrative Code of the City of New York, to redress discrimination with respect to terms and conditions or privileges of employment.

12.     This court has additional supplemental and pendant jurisdiction over all related claims.

## PROCEDURAL BACKGROUND

13.     Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about September 22, 2017. Plaintiff files this action within ninety (90) days of her receipt of the Notice of Right to Sue issued by the EEOC on or about June 19, 2018.

## OPERATIVE FACTS

### Introduction

14.     Plaintiff, an African-American woman, came to Defendant with high hopes: she believed in Defendant's mission, and knew that with her 20 years of Social Work experience she could make a difference at Defendant, and for Defendant's clients.

15.     In particular, Plaintiff realized that she could help change the fact that a majority of Defendant's employees in leadership positions were white, while 98% of their clients were African-American or Latino.

16.     Plaintiff had successfully worked to participate in and facilitate anti-racism workshops in majority white workplaces. In these workshops, leadership and staff discussed the internal and external racism that affected their work, in an effort to improve the services they provide.

17.     However, when Plaintiff spoke about racism inside and outside Defendant to Joel Copperman, CEO of Defendant (hereinafter "CEO Copperman"), a white man, he was avoidant, and later hostile, to her suggestions.

18.     During her tenure at Defendant, Plaintiff became increasingly concerned that a discussion of racism was necessary: despite the grave need for diversity in the leadership and staff at Defendant, Defendant hired and promoted white employees over minorities; and white leadership routinely discriminated against minority applicants to Defendant.

19.     Eventually, because of her suggestions to discuss racism inside and outside Defendant, and because she was an African-American woman in a white led organization, Plaintiff's responsibilities were taken away and reassigned to two white women, one of whom had far less experience than she did.

20.     Defendant ultimately fired Plaintiff because of her race, and because she continued to bring up the need for anti-racism workshops at Defendant.

### Plaintiff is Hired Because of Her Exceptional Experience

21.     Plaintiff is a Licensed Clinical Social Worker ("LCSW"), who completed a Masters Degree in Social Work from Marywood University. She has over 20 years of experience in the non-profit sector, including working as a social worker, social work supervisor, assistant director, and program director,  at Jewish Board of Family and Children's Services, New Alternatives for Children, ARGUS Community Inc., and Harlem-Dowling West Side Center for Children's Services.

22.     Plaintiff applied to Defendant because she was very excited about, according to their website, they "tailor [their] services to each individual's unique needs, risks, and strengths and believe the most effective programs are evidence-based, family-focused, and trauma informed."

23.     She was particularly excited that Defendant's website touted their commitment to diversity of their staff, in that "each CASES staff member [was] critical," and that their team was "strengthened by [their] diversity of backgrounds, perspectives, and talents, united by a common purpose."

24.     Defendant's website also assured that Defendant was "determined to continuously enhance [its] knowledge and skills, evaluate [its] results, and learn from [its] successes and failures.

25.     After a long interview process in which Plaintiff met with several members of the management team, she started work at Defendant on January 26, 2015. She was hired as Clinical Director for Defendant's Youth Division.

26.     Defendant had two divisions - Adult Programs and Youth Programs. Adult Programs, which had a majority white supervisory staff and an out-patient mental health clinic, was larger and had more lucrative contracts for programs that required personnel that had licensed employees. By 2016, the Adult Program was taking on new staff, and the majority of the new hires where white.

27.     In addition, Plaintiff had oversight over a smaller program called Adolescent Portable Therapy (hereinafter "APT") and the Health and Well-Being Unit. APT was a favorite program of CEO Copperman, who kept it afloat despite a lack of funding. The staff of APT was majority white, with the

4

exception of one woman who was British and bi-racial.

28.     Youth programs were mainly community-based programs which had smaller funding streams. Being a community-based program, it was sidelined, and in this program was the highest concentration of minority staff.

29.     As Clinical Director, Plaintiff was responsible for providing clinical supervision and direction for social workers and caseworkers in the Youth Programs. Plaintiff had oversight over the largest program in the Youth Programs, the Court Employment Program (hereinafter "CEP"), which was an alternative to incarceration program for youth ages 16 to 24 years old.

30.     As Clinical Director, Plaintiff reported to the Director of Youth Programs, Rukia Lumumba (hereinafter "Director Lumumba"), an African-American woman, who reported to the CEO of Defendant, Joel Copperman (hereinafter "CEO Copperman"), a white man.

31.     Plaintiff came to Defendant with excitement, because she believed in Defendant's mission, and believed that her 20 years of experience could really make a difference in the lives of Defendant's clients'..

### Plaintiff Immediately Sees the Need for Anti-Racism Work at Defendant

32.     Upon arriving at Defendant, Plaintiff noticed that a majority of the leadership and the supervising staff at Defendant were white, while 98% of Defendant's clients were African-American.

33.     Owing to her significant experience in organizations with similar demographics, Plaintiff immediately recognized that because of this disparity, implementing "anti-racism" workshops was necessary at Defendant. She had successfully implemented these types of workshops at other organizations.

34.     Plaintiff knew that an anti-racism agenda would raise awareness of the lack of diversity among leadership staff and management, so more minority voices could be represented at Defendant. She was particularly concerned with the lack of minorities in management and social work positions at Defendant.

35.     Plaintiff also believed that staff at Defendant could explore the myriad ways that institutional racism at Defendant manifests – such as minority employees being given fewer benefits,

promotions, or raises at Defendant, or being sidelined socially or in meetings or conferences.

36.    In addition, she knew that relationships between white staff members and minority clients were sometimes fraught, and that anti-racism workshops could assist white staff members in relating more successfully to their clients, which would lead to better outcomes with their clients. This could be done by exploring white staff members' own relationship to race, as well as alert them to the societal and structural racism that their clients face outside in the world.

37.    Though she was surprised that, given Defendant's mission and promised commitment to diversity the institutional racism was not being addressed, Plaintiff was looking forward to sharing her knowledge and ideas with CEO Copperman, whom she assumed would be completely on board with such programming, given the mission of the organization.

### Plaintiff is Taken Aback When CEO Copperman Tables Conversations About an Anti-Racism Workshop

38.    During her first week on the job, in or about the end of January 2015, Plaintiff noticed that there did not appear to be any antiracism measures in effect.  Still, she assumed that the organization addressed anti-racism  issues in some fashion, given its mission.

39.    During her first meeting with CEO Copperman, Plaintiff was pleased to be warmly welcomed, and to learn from CEO Copperman that he was impressed with her significant work experience in her field. When the conversation turned to how Plaintiff saw her role developing at Defendant, she was eager to share her ideas to what she thought was an open and interested audience.

40.    In addition to discussing her plans for developing and improving the programs she oversaw, Plaintiff excitedly shared her plans to implement anti-racism work, as she had implemented in a previous position, at the Jewish Board of Family and Children's Services.

41.    She explained to Copperman in great detail the organization's positive embrace of this work, and the broad implementation of anti-racism workshops in the organization.

42.    Assuming that he was fully aware of, and concerned by the racial disparity amongst the staff, Plaintiff further expressed a desire to correct the disparity.

43.     Instead, CEO Copperman immediately tensed up and became noticeably agitated. He was clearly annoyed by and entirely avoidant of Plaintiff's suggestion. Surprised by his reaction, Plaintiff asked what kind of anti-racism programming Defendant had in place, and was shocked when CEO Copperman conceded that Defendant had not implemented any anti-racism programming but that he was planning on "looking into it" and that she did not need to worry about it.

44.     Plaintiff was struck by that fact that CEO Copperman was conversational and cordial before she brought up the anti-racism work, and extremely annoyed after she did so. She was disappointed because she believed that anti-racism work would be extremely valuable to the mission of Defendant and was determined to convince CEO Copperman that it should be implemented in order for Defendant to successfully implement its mission.

### Plaintiff Provides Exceptional Work for Defendant

45.     As a commensurate professional and had two decades of experience in Clinical Social Work, Plaintiff immediately excelled at her job. Plaintiff travelled between Defendant's two different locations – in Harlem and Brooklyn - to provide supervision to the programs' social workers and case managers. She was responsible for the day-to-day operations of the programs under her purview and met with the staff and the directors of each program to evaluate their progress. Plaintiff worked exceptionally long hours, and occasionally on weekends.

### CEO Copperman Refuses to Socialize with Plaintiff and Other Minority Employees, Only Socializing With White Employees

46.     From her experience as an African-American woman and as a result of her anti-racism work, Plaintiff is and has long been well aware of and in tune with the subtle and not so subtle ways in which white managers or employees discriminate against minority employees, to their detriment and she sadly observed discrimination at Defendant.

47.     For example, Plaintiff noted that CEO Copperman socialized with white managers and employees but failed to socialize with minority employees.

48.     CEO Copperman walked right by Plaintiff's desk, even though her door was always open,

7

to speak to white employees at Defendant. She noticed that CEO Copperman did the same to other minority employees.

49.     This type of discrimination made Plaintiff and other minorities feel unwelcome at Defendant, and uninvolved in the decision-making and workings of the organization.

50.     Plaintiff grew more frustrated, and more convinced that an anti-racism workshop, in which she and minority employees could express their concerns about discrimination in the workplace, was essential to Defendant's success.

### CEO Copperman asks Plaintiff to Falsify a Document for an Employee Who Was Retiring So that She Could Illegally Collect Unemployment Insurance

51.     In or about April 2015, Ruth Maldonaldo (hereinafter "Ms. Maldonado"), one of the employees whom Plaintiff supervised, announced that she would retire at the end of April.

52.     As Ms. Maldonado's supervisor, Plaintiff was responsible for completing the paperwork for the end of her employment and sent it to the Human Resources department. Plaintiff indicated on the form that Ms. Maldonado was retiring. To her great surprise, the form was returned to her from Human Resources with an instruction that she must indicate that Ms. Maldonado was terminated without prejudice.

53.     Human Resources told Plaintiff to do this explicitly so that Ms. Maldonado could collect unemployment insurance. Upon information and belief, she would not be entitled to unemployment insurance if she retired.

54.     Plaintiff spoke to Human Resources and objected, saying that Ms. Maldonado had announced that she was retiring and that she did not feel comfortable lying. Human Resources told Plaintiff that this was non-negotiable. Upon information and belief, this instruction was delivered by CEO Copperman.

55.     Plaintiff felt extremely uncomfortable with Defendant lying to the New York State government about an employee.

### The Adult Program has a Majority of White Supervisors and Employees, CEO Copperman Hires a White Director

56.     Concerned with the lack of diversity at Defendant, Plaintiff soon noticed that just like the

other programs at Defendant, most of the supervisors, social workers and caseworkers in the Adult Program were white.

57.     In or about April and May 2016, CEO Copperman hired Karen Dubin McKnight (hereinafter "Director McKnight"), a white woman, to head the Adult Program.

58.     Plaintiff made a mental note of the fact that with this new hire, Defendant had yet again failed to address the lack of diversity in the leadership at Defendant. Charging Being new to Defendant, Plaintiff did not feel comfortable bringing up this disparity with CEO Copperman.

59.     She decided that the next time she had the opportunity to talk about racism within and outside of Defendant, she would again remind Defendant that anti-racism work could ameliorate the problem, and that she would lobby for the programming to be implemented.

60.     Given CEO Copperman's promise that he would "look into" doing this, she hoped that he would be receptive to same..

### CEO Copperman Shuts Down Plaintiff's Efforts to Examine Racism in Defendant's Programs and Structural Racism in Society

61.     In or around June 2015, within six months of her start date at Defendant, Defendant experienced a tragic event that had a grave impact the organization's work. One of their participants who had successfully completed Defendant's alternative to incarceration program had gone on to be accused of a high-profile shooting that resulted in a death of another person.

62.     Director Lumumba told Plaintiff that CEO Copperman wanted to hold a meeting with the leadership of Defendant to discuss where they went wrong in failing to prevent this tragic event, and Director Lumumba asked Plaintiff to facilitate the meeting.

63.     Plaintiff spent many days preparing for this event, by studying Defendant's programs and coming up with policy recommendations.

64.     In the meeting in or about June 2015, Plaintiff presented the first two-thirds of the agenda, which included an introduction, the purpose of the meeting, and a recap of the programs young man encountered within Defendant and how Defendant's program may have failed this particular individual.

65.     Plaintiff then began to speak to conclusions and recommendations. She began to speak of the ways in which racism in society and racial bias within Defendant's programs had likely affected this client, and all of their clients, and how these factors may impact future outcomes in their programs. She discussed how Defendant's staff could work to overcome these obstacles so as to better serve their clients.

66.     When Plaintiff started to talk about these issues concerning racism within and outside of Defendant, CEO Copperman rudely interrupted her and did not allow Plaintiff to finish her presentation. When she tried to speak again, he cut her off immediately, and redirected the conversation.

67.     Shocked, Plaintiff stayed mute for the rest of the discussion, humiliated by CEO Copperman's behavior, and upset that her attempts to talk about race issues within Defendant were stifled by CEO Copperman.

68.     Ironically, interrupting a minority speaker when she spoke about racism is another race based aggression that silences minorities in the workplace.

69.     Plaintiff was confused at CEO Copperman's behavior, however, because he had requested that she facilitate the meeting, and she had assumed that in their first meeting he was going to "look into" racism inside and outside Defendant.

70.     After the meeting, Plaintiff attempted to speak to Director Lumumba about the incident. She told her that she was shocked and confused by CEO Copperman's actions at the meeting, specifically the fact that he had cut her off the moment that she introduced racism as a factor in Defendant's work. but she dismissed her concerns, saying "that's just how Joel is."

71.     Plaintiff was disappointed that her report to Director Lumumba, one of the few African-American women in leadership, had fallen on deaf ears.

72.     Upon information and belief, as one of only two high level minority managers in a majority white organization, and one who had to answer to CEO Copperman who displayed clear bias against minority employees, Director Lumumba did not want to "rock the boat" in discussing CEO Copperman's discriminatory behavior.

10

**CEO Copperman Creates a Hostile Work Environment for Plaintiff**

73.     Immediately following this meeting, CEO Copperman went from largely dismissive of her to outright hostile.

74.     When Plaintiff walked past CEO Copperman, he would not acknowledge her presence even though she tried to make eye contact with him. When she attempted to remedy the situation by starting small talk with him, he would give brusque and curt answers to her questions without stopping or slowing down and constantly seemed to be trying to ignore and avoid her.

75.     In contrast, CEO Copperman would happily walk past Plaintiff to make small talk with white employees whose desks were right outside her office. In group interactions he would talk to white employees but not to Plaintiff, as if she were invisible to him.

76.     Again, Plaintiff was dismayed that CEO Copperman discriminated against her in this way, even when she tried her best to engage with him.

**Plaintiff is Shocked When The White Director Blatantly Discriminates Against
Minority Employees and an African-American Female Job Applicant**

77.     After Director McKnight was hired, Plaintiff saw that she, like CEO Copperman, treated minority employees differently than white employees. She was particularly abusive to the African-American male employees, whom she patronized, belittled, and criticized. Plaintiff witnessed Director McKnight treat white employees in a far more respectful and kind manner.

78.     In or about June or July 2016, Plaintiff was excited when a highly qualified, African American court liaison from the CEP program applied for a position in the Adult Division (the "Applicant"). Everyone in the CEP program had very high esteem for the Applicant, and the Applicant had significant experience at Defendant.

79.     Plaintiff encouraged the Applicant to apply for the position and championed her application with Director McKnight.

80.     Plaintiff was shocked, however, when Director McKnight told Plaintiff that the Applicant had "attitude" and was too "aggressive" for the position. Plaintiff knew this was false because the Applicant

11

had only positive performance reviews from her prior supervisors and high regard amongst peers and colleagues.

81.     Upon information and belief, the terms "attitude and "aggressive" are stereotypical and racist comments revealing bias at Defendant.

82.     Plaintiff told Director McKnight that she received only positive feedback about the Applicant, that the Applicant had the necessary experience, and that she would be excellent. Director McKnight responded that she may hire the Applicant despite her "attitude," but pondered that if she did, she would "have to keep her eye on her."

83.     Upon information and belief, Director McKnight relied on stereotypical beliefs about African-American women when she disparaged the African American Applicant and discriminated against her based on her race.

84.     Plaintiff took Director Lumumba aside and told her that she believed what Director McKnight had said about the Applicant being "aggressive," having "attitude" and needing to "keep an eye on her" sounded like she was discriminating against the African-American applicant, but Director Lumumba answered that this was "just how Karen is."

85.     Plaintiff was extremely frustrated that whenever she attempted to discuss issues she had with white leadership at Defendant that might indicate bias, Director Lumumba attributed this to personality differences, which she knew was not the issue.

86.     Plaintiff was upset that when she pointed out possible racism or bias in Defendant, her concerns had been dismissed yet again.

### CEO Copperman Gives Plaintiff's
### Responsibilities at Defendant to a White Employee

87.     To Plaintiff's shock, in or about July or August 2015, immediately following the meeting in which CEO Copperman did not allow her to talk, Director Lumumba told Plaintiff that she would no longer supervise the social workers and caseworkers in the APT program because CEO Copperman wanted to "take the program in a different direction."

88.     Plaintiff was flabbergasted, because she knew she had being doing an exceptional job working in the APT program and wondered why CEO Copperman had taken away this major responsibility.

89.     She was even more offended when she learned that her responsibilities had been reassigned to Cheri Fines, ("Supervisor Fines"), a white woman; the senior social workers s whom Plaintiff previously supervised would be supervised by Supervisor Fines an outside agency consultant.

90.     Plaintiff was afraid that CEO Copperman had punished her because she had "rocked the boat" by criticizing Defendant's institutional racism and suggesting that Defendant's leadership and employees talk about and address racism within Defendant.

91.     Upon information and belief, as a white man, CEO Copperman was threatened by an African-American woman bringing up racism. In addition, upon information and belief, CEO Copperman did not want Plaintiff to share her belief that the organization needed more diversity and race awareness.

92.     Plaintiff was also extremely frustrated by this further showing of classic institutional racism, in which a minority woman in a leadership position was sidelined, while a white woman was given more leadership and responsibility at Defendant.

### Plaintiff Continues to do Exceptional Work at Defendant

93.     Despite the change in her job description, Plaintiff continued to do exceptional work for Defendant. She set up group trainings for her staff, trained new social workers and case workers, and helped them to resolve issues and conflicts in their very demanding work.

94.     Plaintiff was recognized for her excellent work by her supervisees, her colleagues, the Directors of other programs, and collaborators outside of the office.

95.     However, CEO Copperman continued to ignore Plaintiff, and never praised her for her exceptional work.

### CEO Copperman Discriminates Against a Highly Qualified African-American Job Applicant

96.     In or about September 2016, Director Lumumba gave Plaintiff authorization to hire a qualified African-American male applicant to a position in her department. He was a current employee and

13

this would have been a promotion.

97.     Plaintiff happily told the applicant that he was selected for the position, he was given a start date, and Human Resources began processing his promotion. Soon, however, Director Lumumba returned to Plaintiff and told her that "Joel didn't want [the African-American candidate]," with no other explanation of why he was not being promoted.

98.     Plaintiff was upset that not only had CEO Copperman had usurped her hiring authority, but that he had also refused to promote a qualified African-American employee while stating pride that Defendant promotes from within. In addition, CEO Copperman had embarrassed the applicant by rescinding his job offer. However, she was forced to follow CEO Copperman's directive, and rescinded the applicant's offer, apologizing profusely and saying she "had no idea" why the offer had been rescinded.

99.     Plaintiff reported the issue to Director Lumumba, stating that the decision "did not make sense," that it was "unfair," and that she had not been given a reason for the decision. Director Lumumba brushed it off, saying that CEO Copperman had the final decision on who to hire, and she should drop the issue.

100.    Plaintiff was then told that Ms. Yaffe had a friend who had wanted the position, who was, upon information and belief, a white male, and who was approved by CEO Copperman. Upon information and belief, the pay was so low for this particular position that the white man declined their offer and they could not find another applicant who would settle for so little pay. Finally, CEO Copperman offered it back to the same African-American applicant, who took the job.

### Plaintiff is Shocked When CEO Copperman Orders Her to Hire a Significantly Unqualified White Woman as a Clinical Supervisor

101.    In September or October 2015, Director Lumumba told Plaintiff that they would be hiring a Clinical Supervisor for the CEP program, who would report directly to her. Upon information and belief, this was with CEO Copperman's knowledge and consent as this would require his approval.

102.    Although Plaintiff had a tremendous workload, she prepared notes for the interview process and interviewed white and minority applicants who were Licensed Masters in Social Work ("LMSWs"),

and had significant experience as Clinical Supervisors.

103.     In or about November 2015, however, Director Lumumba instructed Plaintiff to interview Andrea Yaffe (hereinafter "Ms. Yaffe"), a white woman, for the position. Ms. Yaffe was then employed at Defendant in the APT Program.

104.     After looking at Ms. Yaffe's resume, Plaintiff was very concerned that she did not have the licensure and experience for the Clinical Supervisor position. Ms. Yaffe had worked for only two years in the APT program, and she had no supervisory experience. In addition, Ms. Yaffe did not yet have her mental health counselor license (LMHC), nor did she have an LMSW. Indeed, Ms. Yaffe was entirely less qualified than the other applicants whom Plaintiff had been considering.

105.     During Plaintiff's interview with Ms. Yaffe, she asked her for her supervisory experience, and Ms. Yaffe responded that she had "been supervised" by staff members in the APT program.

106.     Following the interview, Plaintiff told Director Lumumba that she did not think Ms. Yaffe was qualified for the job. Ms. Lumumba told her curtly that she was ordered to hire Ms. Yaffe nonetheless.

107.     Plaintiff soon found out from other employees that CEO Copperman had already championed Ms. Yaffe at Defendant.

108.     Ever the dutiful employee, Plaintiff conducted her working relationship with Ms. Yaffe professionally, and even set up supervisory trainings for her so that she could obtain some of the necessary experience that she lacked. This training was so highly regarded that CEO Copperman sent the other long-term Youth Program Director to the training.

109.     Again, however, Plaintiff was concerned about the lack of diversity at Defendant, and saw that yet again, Defendant had hired a less qualified white applicant over a minority applicant at a majority white organization.

### Plaintiff is Sidelined in the Department, and CEO Copperman Champions the Inexperienced White Woman

110.     Ms. Yaffe started at Defendant in February 2016. Immediately, CEO Copperman invited Ms. Yaffe to meetings from which Plaintiff was excluded, even though Ms. Yaffe was Plaintiff's direct

report.

111.    This provided Plaintiff with less access to staff, information and resources to perform administrative duties, make program decisions, interact with community partners and it diminished my authority in front of staff.

112.    Plaintiff feared that CEO Copperman was again discriminating against her as a minority woman, by sidelining her within her own Department and giving her responsibilities to an unqualified white woman.

113.    Upon information and belief, a few months later, CEO Copperman gave Ms. Yaffe a $5,000 raise for obtaining her license, an amount that was unprecedented at Defendant for a new employee. Upon information and belief, employee bonuses for obtaining one's license at Defendant were normally in the $500-$1,000 range, and pursuant to the policy and procedure manual, other employees were required to wait 15 months for their first salary increase.

114.    Plaintiff only once received a 2% raise, after completing 15 months of service at Defendant.

**The White Director Discriminates Against An African-American Job Applicant**

115.    In or about June 2016 Plaintiff spoke to a highly-qualified African-American employee of Defendant who had applied for a position in Director McKnight's program. He told her that in his interview Director McKnight was patronizing, dismissive, and did not pay attention to the answers he gave to her questions, and he ultimately was not hired for the job.

116.    Plaintiff knew that this type of behavior was the reason for the lack of diversity of employees at Defendant and strongly believed that she should still bring up discrimination within the workplace in a future staff meeting.

**Plaintiff Sees That the New White Director Racially Discriminates Against**
**Minority Employees**

117.    In or about May or June 2016, when Director McKnight asked one of Plaintiff's African-American direct reports to attend a meeting, he told Plaintiff that he felt uncomfortable going alone to the meeting because of Director McKnight's attitude towards minority employees. The employee asked

Plaintiff to accompany him to the meeting, so he could have her support.

118.     In the meeting, Director McKnight ignored Plaintiff and the employee for ten minutes while talking to another white employee, forcing them to stand beside her desk like children, without acknowledging them. Plaintiff finally interrupted Director McKnight and politely asked if they should leave and come back another time, and she reluctantly engaged them in conversation.

119.     Plaintiff brought this treatment up with Director Lumumba, telling her specifically that she and the other African-American employee had been humiliated standing next to Director McKnight's desk while she ignored them.  She again dismissed Plaintiff's concerns and excused the behavior, this time saying that that Director McKnight was "just brusque."

120.     Plaintiff realized that any time she tried to report to Director Lumumba about the racism that occurred between the white leadership and the minority employees, she dismissed it as just a personality issue.

121.     Even after Plaintiff reported the discrimination, nothing was done, and Director McKnight continued to speak to minority employees in a disparaging manner. Plaintiff knew that if Defendant engaged in anti-racism trainings, she and other minority staff could make herself heard, and this would improve her working environment.

### CEO Copperman is Hostile to Plaintiff at a Staff-Wide Meeting
### Because She Again Brings up Structural Racism

122.     In June 2016, Defendant had their semi-annual staff meeting, and because of Plaintiff's experience leading the Health and Well-Being Unit, Director Lumumba asked Plaintiff to be on a panel concerning "access to health care" for Defendant's clients. The entire staff was present at the meeting.

123.     Plaintiff diligently prepared for the panel discussion, doing considerable research on how Defendant could best provide health services to their clients. In her research, she discovered a study by the Federal Center for Disease Control which identified racism as a public health issue getting in the way of clients accessing health services and achieving overall health and well-being.

124.     The meeting occurred in or about late June 2016. It was moderated by Director Lumumba,

but Plaintiff's co-panelists were a white female staff member and a white male staff person. Each panel member was given approximately 10 minutes to make a presentation, and then participants in the meeting were given time to ask questions.

125.     Plaintiff used her time to cite to the Center for Disease Control study, as well as statistics that outlined how minorities faced specific barriers to health care access that white clients did not face. This was entirely relevant of course, since Defendant's client population is almost entirely minority.

126.     During this meeting, the white man took the microphone away from her, spoke, and then handed the microphone to the white woman. He and the other white employee also sidelined Director Lumumba and monopolized the conversation. They did not allow Plaintiff to speak again at the meeting, and she sat on the panel shocked and humiliated at her treatment by the white employees.

127.     Yet again, in suffering racism and discrimination at Defendant at the hands of white employees, Plaintiff knew that an anti-racism workshop for employees would be critical to Defendant's work.

128.     Following the panel, CEO Copperman was very cold to Plaintiff, and ignored her eye contact at the lunch afterwards. She also heard him praise the other panelists for their participation in the panel, but did not speak to Plaintiff. When Plaintiff attempted to find CEO Copperman to discuss what he thought of her presentation, he moved away from her several times and refused to engage.

129.     Plaintiff was very confused. In her initial meeting with CEO Copperman, he seemed open to having Plaintiff conduct anti-racism trainings and discussing race issues. Yet when she brought up these issues, CEO Copperman was hostile to her as a result.

130.     Meanwhile, immediately after the presentation, minority employees at Defendant approached Plaintiff and told her that they were grateful for her presentation. They also acknowledged the behavior of the white panel members towards her and Director Lumumba. They shared stories of the racism that they experienced at Defendant and agreed that racism and structural racism in Defendant should be addressed, given the minority populations of their clients.

### CEO Copperman Takes Away Plaintiff's Responsibilities Yet Again and
### Gives Them to the Unqualified White Woman

131.    A short time after the meeting, in or about June 2016, Team Member Lumumba informed

Plaintiff that she would no longer have direct supervision of the CEP program but would be given more

administrative responsibilities.

132.    In fact, Director Lumumba told her, Clinical Supervisor Yaffe, the white employee who

had less experience than Plaintiff and was her direct report, would take over her responsibilities as Director

of CEP.

133.    Plaintiff was flabbergasted. More than 50% of her role at Defendant was the oversight of

the CEP program, and she would no longer supervise CEP social workers, counselors, and one assistant.

Her only direct report would be a "benefits coordinator." To add insult to injury, she would no longer

supervise Ms. Yaffe herself.

134.    Notably, Ms. Yaffe did not have a LCSW like Plaintiff, nor did she have supervisory

experience beyond her four months as Clinical Supervisor, and so her supervision of social workers in the

program was highly unusual. Additionally her clinical supervision of the social workers could not be

recognized by New York State, impacting their licensing.

135.    In addition, Plaintiff would no longer participate in management meetings, in which she

would formerly report on developments at CEP to CEO Copperman.

136.    Plaintiff was devastated: first, her supervision over ATP was given to one white woman,

and then her supervision over the CEP program was given to another white woman, with less experience

than she had.  She knew that she was being sidelined by CEO Copperman because of her race, and her

discussion of racism inside and outside of Defendant.

137.    Fearing for her job, Plaintiff immediately asked Ms. Lumumba if her job was in jeopardy.

Director Lumumba assured Plaintiff that this had nothing to do with her performance, which was excellent,

but that CEO Copperman wanted to take the program "in a different direction."

138.    Upon information and belief, CEO Copperman wanted to make sure that Defendant was

not forced to address race issues with its staff.

### CEO Copperman Champions the Inexperienced White Woman
### to the Detriment of Plaintiff

139.  In a meeting with the leadership of Defendant that same month, in or about August 2016, CEO Cooperman's celebrated Ms. Yaffe's promotion and emphasized her new role by displaying Defendant's new organizational chart.

140.  In addition, CEO Copperman warmly spoke to and about Ms. Yaffe, announcing that he would be "working closely with" and directly supervising her. This was the type of attention from CEO Copperman that Plaintiff never received as the Director of CEP.

141.  At that point she knew that she was a "nobody" at Defendant, and was vulnerable to being fired, despite her exceptional work at Defendant.

142.  She was again dismayed she, as an African-American woman, had been demoted and undermined at Defendant, and that white employees were promoted and given special attention at the expense of minority employees like herself.

### CEO Copperman Gives White Woman Clinical Supervision, But Explicitly
### Denies The Same to Plaintiff

143.  In a further insult, in the meeting with leadership, CEO Copperman announced that Ms. Yaffe would be given Clinical Supervision by a new hire named Dr. Mardoche Sidor (hereinafter "Dr. Sidor"), the type of supervision that Plaintiff had never received at Defendant.

144.  Following the meeting, Plaintiff asked Director Lumumba if Dr. Sidor would also supervise her work, reminding her that she had asked for this supervision in her first six months at Defendant.

145.  Director Lumumba said that she must check with CEO Copperman but she "didn't think it would be a problem," and told her it had been approved.

146.  Plaintiff called Dr. Sidor to set up an appointment to talk, and he agreed. A few days later, however, Dr. Sidor told her he could not have the meeting because CEO Copperman had rescinded his approval of her request for supervision.

**CEO Copperman Again Sidelines Plaintiff at a Meeting, and Champions the
Unqualified White Woman**

147.     Despite being humiliated at her demotion, Plaintiff continued to diligently work on her newly diminished responsibilities, hoping to save her job.

148.     In or about September 2016 Plaintiff requested that Director Lumumba set up a meeting with all of the Youth Department directors to discuss what staff trainings she could facilitate that they may need in the coming months.

149.     Suddenly, Director Lumumba informed Charging Party that CEO Copperman and told her that he wanted to use this meeting with the Youth Directors for "another purpose," though he failed to identify the other purpose.

150.     At this meeting, Plaintiff was relegated to the side of the table, while CEO Copperman sat at the head of the table, with Ms. Yaffe beside him helping to facilitate the meeting. The visuals of this meeting were stark – Plaintiff and the other staff of various programs who were sidelined were minority, while CEO Copperman and Ms. Yaffe were white.

151.     CEO Copperman used this meeting to emphasize Ms. Yaffe's prominent role within the Youth Division, and the fact that he would be supervising and working closely with her.

152.     Plaintiff was not given the opportunity to ask the participants about upcoming trainings, and CEO Copperman ignored her and walked away from the meeting with Ms. Yaffe without ever engaging with her.

153.     Plaintiff was humiliated in front of her colleagues, because it was clear she had been demoted, and her responsibilities given to someone else.

154.     After the meeting, several minority employees expressed their shock and dismay that Plaintiff had been demoted and humiliated in this way by CEO Copperman. They told Plaintiff that they knew she had done excellent work at Defendant, and that given her performance they couldn't believe she had been sidelined.

155.     Minority employees quietly expressed concern that CEO Copperman had favored a white

employee above her, who was a minority. Minority employees told Plaintiff that they were "sorry for what happened" and "we support you either way."

### Even After Being Demoted and Given Less Responsibilities, Plaintiff's Few Responsibilities are Again Given to the Unqualified White Woman

156.     In or about October 2016, Plaintiff learned that Defendant received new funding for a Young Women's Initiative. Three months prior, in August 2016, Plaintiff had given feedback on the proposal, which stated that part of her salary was included in the costs of the program and so she was happy to begin work on the Initiative when the funding came through.

157.     However, at a meeting outside of the office that same month, a program consultant who was a staff member in the Mayor's Office of Criminal Justice, who had worked with Plaintiff in program development, asked Plaintiff if she was attending an upcoming meeting concerning the Youth Women's Initiative.

158.     Shocked and humiliated that she had not been included, Plaintiff stuttered embarrassingly that she had not been told about the meeting. The colleague looked embarrassed and confused because she knew that Plaintiff had been involved in the proposal for the Initiative.

159.     Later, Plaintiff discovered that the Young Women's Initiative had also been reassigned to Ms. Yaffe.

### Plaintiff is Terminated When She Asks to Have Meeting about An Anti-Racism Workshop for Employees at Defendant

160.     in November 2016, given that her few remaining responsibilities included employee training, Plaintiff immediately set out to plan several trainings for the upcoming months.

161.     Plaintiff was thrilled that one of her trainings could finally address racism inside and outside Defendant and began to prepare for this training along with others. Plaintiff was hesitant to bring up the program to CEO Copperman because of his prior reaction to her discussion of racism at Defendant, and wanted to proceed slowly, with CEO Copperman's consent.

162.     Plaintiff wanted to slowly introduce anti-racism to an increasingly white staff through the lens of white privilege. Therefore Plaintiff wanted permission to distribute an renowned article on white

privilege to all staff in the agency. She also wanted to discuss a creating a training for staff on implicit bias.

163.    Plaintiff knew that Directors sending staff-wide emails about topics related to work was not unusual in the agency, yet given CEO Cooperman's previous responses to her bringing up the subject, she proceeded carefully.

164.    Given the sensitive nature of the content of her email, Plaintiff checked with the Human Resources department to see whether there were any personnel policies that would prohibit her sending the email. Human Resources assured her that there were no issues with sending this article.

165.    Given its importance to Defendant's work, Plaintiff scheduled a meeting with CEO Copperman.

166.    Upon information and belief, Human Resources made CEO Copperman aware of Plaintiff's request.

167.    Given the response from CEO Copperman the several times she brought up structural racism, she asked for a meeting with him to discuss her new program proposal. Unfazed, the remembered that CEO Copperman had told her in their first meeting that he would "look into" doing this type of workshop.

168.    The meeting with CEO Copperman occurred on November 29, 2016. The second that Plaintiff sat down, and before she began to talk about the racism training, CEO Copperman told Plaintiff that "he knew she was there to talk about something else," but that they had lost funding for her position and that she would be laid off in December 2016.

169.    Plaintiff was shocked. She asked CEO Copperman if she was being "laid off" for her performance, but CEO Copperman assured her that this was not the case, but that this was simply a "funding issue."

170.    Plaintiff knew that this was false, however, because when the funding for other employee's programs had been cut, CEO Copperman always found a position for them in another program at Defendant.

171.    CEO Copperman said to Plaintiff patronizingly, "This hasn't been a good fit for you, has it?" Plaintiff disagreed, saying that she loved her work, she was good at it, and she was even flexible when

her job description changed several times.

172.     Upon information and belief, CEO Copperman did not consider Plaintiff to be "a good fit," because, as an African-American woman in an ever increasingly white organization that had a majority white leadership, she had challenged the status quo by speaking of racism, and recommending employee trainings on the same.

173.     As Plaintiff sat in CEO Copperman's office stunned, he asked her if she wanted to make a second meeting to discuss the terms of her separation from Defendant. CEO Copperman patronizingly suggested she leave early as a result of the impact of the news just received.

174.     At this second meeting in or about early December 2016, Plaintiff again asked CEO Copperman if this was performance related, and he answered that it was not.

175.     Plaintiff was shocked at her treatment by CEO Copperman, because never in her 20 years of exceptional experience in her field, had she been discriminated against and subjected to a hostile work environment at an organization like Defendant.

176.     Upon information and belief, Plaintiff was terminated because of her belief that anti-racism programs were necessary at Defendant.

## CLAIMS FOR RELIEF

## AS AND FOR A FIRST CAUSE OF ACTION

*(Race Discrimination in Violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 the New York State Human Rights Law, and the New York City Human Rights Law)*

177.     Plaintiff repeats and re-alleges each and every allegation contained in the proceeding paragraphs as if set forth herein.

178.     Plaintiff is an African-American female and is therefore a member of a protected class. Plaintiff was qualified to work as an employee for Defendants and she satisfactorily performed the duties required by the position she held at Defendants.

179.     Defendants intentionally subjected Plaintiff to a hostile work environment, disparate treatment, and an atmosphere of adverse employment actions and decisions that culminated in Plaintiff's

unlawful discharge, because of her race and/or skin color in violation of Plaintiff's statutory and constitutional rights.

180.    The discriminatory actions perpetrated against Plaintiff were performed purposefully or with willful indifference by Defendants and were in accordance with Defendants' custom and/or policy of discrimination.

181.    By reason of Defendants' repeated violations of Plaintiff's statutory and constitutional rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

182.    As a further direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

183.    Plaintiff was discriminated against and subjected to race and/or skin color discrimination that created a hostile work environment by Defendants based on her race and/or skin color in violation of § 1981 of the United States Code, 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 the New York State Human Rights Law, and the New York City Human Rights Law. As a result of Defendants' violation, Plaintiff has been damaged in an amount to be determined by a Jury.

## AS AND FOR A SECOND CAUSE OF ACTION

*(Retaliation in Violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law)*

184.    Plaintiff repeats and re-alleges each and every allegation contained in the proceeding paragraphs as if set forth herein.

185.    As set forth in detail above, Defendants subjected Plaintiff to a hostile work environment, disparate treatment, and an atmosphere of adverse employment actions and decisions because of her race and/or skin color in violation of Plaintiff's statutory and constitutional rights. Plaintiff repeatedly complained to Defendants and/or Defendants' policymakers who themselves regularly witnessed the severe

and pervasive race and/or skin color discrimination and hostile work environment she was subjected to during her employment with Defendants.

186.     Plaintiff notified Defendants of the severe race and/or skin color discrimination and hostile work environment she was subjected to and protested the harassment and the fact that Defendants failed to act responsively.

187.     Plaintiff's complaints were repeatedly ignored and discouraged by Defendants in accordance with Defendants' policy, practice, and/or custom of discrimination and retaliation.

188.     Defendants, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of her race and/or skin color discrimination and a hostile work environment.

189.     Because she protested Defendants' unlawful behavior, Plaintiff was subjected to retaliation throughout the course of her employment.

190.     The retaliation substantially interfered with Plaintiff's employment and created an intimidating, offensive, and hostile work environment.

191.     Defendants knew or should have known about the retaliation and the affect it had on Plaintiff's employment but failed to take any action to stop the retaliatory conduct, and in fact allowed Plaintiff to suffer a retaliatory termination.

192.     As a direct and proximate result of said unlawful employment practices and  disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to: wages, social security, and other benefits due her.

193.     Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of her rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

194.     As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity, painful embarrassment among her family, friends,

and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

195.    Based on the foregoing, Plaintiff was retaliated against and suffered a retaliatory termination by Defendants in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 the New York State Human Rights Law, and the New York City Human Rights Law. As a result of Defendants' retaliatory actions, Plaintiff has been damaged in an amount to be determined by a Jury.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

(i)     On the First Cause of Action, awarding Plaintiff compensatory and other damages including punitive damages in an amount to be determined at trial;

(ii)    On the Second Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial;

(iii)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Dated:  New York, NY
        July 18, 2018

                                    Respectfully submitted,

                                    GODDARD LAW PLLC
                                    *Attorney for Plaintiff*

                                    By:__/s/ Megan S. Goddard__
                                    Megan S. Goddard, Esq.
                                    39 Broadway, Suite 1540
                                    New York, NY 10006
                                    Ofe: 646-504-8363
                                    Fax: 212-473-8705
                                    Megan@goddardlawnyc.com